## STATE OF CONNECTICUT *v.* EVERALD HOWARD
### (14285)

Shea, Callahan, Covello, Borden and Berdon, Js.

448

Argued November 8, 1991—decision released March 17, 1992

*Elizabeth M. Inkster,* assistant public defender, with whom, on the brief was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Rosita M. Creamer,* senior assistant state's attorney, for the appellee (state).

SHEA, J. After a jury trial, the defendant, Everald Howard, was found guilty of the following crimes: robbery in the first degree, General Statutes § 53a-134 (a) (4);[1]

---

[1] General Statutes § 53a-134 (a) (4) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

conspiracy to commit robbery in the first degree, General Statutes §§ 53a-48 and 53a-134 (a) (4);[2] burglary in the first degree, General Statutes § 53a-101 (a) (2);[3] conspiracy to commit burglary in the first degree, General Statutes §§ 53a-48 and 53a-101 (a) (2);[4] and assault in the second degree, General Statutes § 53a-60 (a) (2).[5] He was subsequently sentenced to eighteen years imprisonment for the robbery conviction, eighteen years for the conspiracy to commit robbery conviction, ten years for the burglary conviction, ten years for the conspiracy to commit burglary conviction, all of which were ordered to be served concurrently, and five years for the assault conviction, to be served consecutive to the other sentences, resulting in an effective term of twenty-three years imprisonment. The defendant appeals from that judgment claiming that the trial court improperly: (1) allowed the admission of in-court and out-of-court identifications of him that were the result of an unnecessarily suggestive pretrial identification

---

[2] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

See footnote 1, supra, for the text of General Statutes § 53a-134 (a) (4).

[3] General Statutes § 53a-101 (a) (2) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] See footnotes 2 and 3 for the text of General Statutes §§ 53a-48 and 53a-101 (a) (2).

[5] General Statutes § 53a-60 (a) (2) provides: "A person is guilty of assault in the second degree when . . . with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

procedure; (2) denied him access to certain psychiatric and juvenile court records pertaining to an alleged accomplice who testified for the prosecution; and (3) convicted him of two counts of conspiracy arising out of a single agreement. We reverse the judgment in part.

The jury could reasonably have found the following facts. On January 11, 1989, Dennis Crosswell, Charlyene Holmes, another person identified only as Jasper and the defendant agreed to steal $15,000 that Jasper believed was hidden in an apartment in a three-family house in Hartford.[6] They decided that Holmes would knock on the door to the apartment, in the hope that, because she was a woman, someone unsuspecting would open it and that they would then all enter the house and steal the money.

That evening, Crosswell, Holmes, Jasper and the defendant drove to the house as agreed. Holmes checked the rear door of the first floor apartment and, finding it locked, returned to the car, where the defendant handed her a loaded revolver. Approximately one-half hour later, Holmes, accompanied by Crosswell, who was wearing a mask, and the defendant, who was not, knocked on the door of the first floor apartment. Suzette Hutchinson came to the door and asked who was there. She opened the door after Holmes had falsely identified herself as "Tuesday," Hutchinson's sister. Crosswell, Holmes and the defendant then pushed the door wide open and entered the kitchen of the apartment where Hutchinson had been watching television with Chesley Smith, her cousin, and Hilda Edwards, their grandmother. Holmes gave the revolver to the defendant, who pointed it at Hutchinson, Smith and Edwards and ordered them into the bedroom. Hutch-

---

[6] Jasper, a drug dealer, was involved in a dispute over drug money with someone living in the house and devised this plan to obtain the money.

inson and Smith complied, but Edwards remained in the kitchen because of her limited ability to walk. Already in the bedroom were several other relatives of Hutchinson: Roxanne Facey, her sister, Timothy Hester, her ten year old brother and Travalis Johnson, her four year old nephew. The defendant pointed the revolver at the group in the bedroom and demanded money. Smith, Hutchinson and Facey gave the defendant a total of $43.75. Meanwhile, Holmes searched the bedroom, overturning the bed, pulling off the mattress and tearing out dresser drawers, but failed to discover any money. The defendant then threatened to shoot Smith if more money was not handed over. When Smith denied knowing about any other money in the apartment, the defendant hit him on the head with the revolver. Smith knelt down and began crying. The defendant then took him to another bedroom where he again hit him on the head with the revolver and punched him in the stomach and shoulders.

While these events were unfolding, Edwards, the grandmother, was screaming from the kitchen. Crosswell hit Edwards on the head to silence her, causing her to cry out louder. When Smith attempted to come to her aid, the defendant prevented him from doing so. The search for money continued throughout the apartment until Holmes noticed a small basement room in which she discovered a pouch containing $15,000. Holmes, Crosswell and the defendant then ran from the house and later divided the money, the defendant receiving $5000, Holmes receiving $4000, Crosswell receiving $2000 and Jasper receiving $4000.

I

In his first claim on appeal, the defendant maintains that identifications of him made from an impermissibly suggestive photographic array and again at trial should have been suppressed as unreliable and viola-

tive of his due process rights under the state and federal constitutions. We conclude that no constitutional violation occurred by admission of the pretrial and trial identifications.

Some background information is necessary for the proper analysis of this claim. Shortly after the crimes were committed, the victims, according to a police report, described the assailants "as one being a Jamaican male . . . five feet eleven in height, a hundred and seventy pounds in weight, dark complexion, having [dreadlocks] and having a tan scarf on the lower portion of his face. The other Jamaican male was described as being five foot nine in height, a hundred and sixty pounds in weight, having [dreadlocks], a mustache and beard, and bearing a handgun." From these descriptions as well as information obtained from other sources, the police suspected the defendant and Crosswell of having committed the crimes. They placed pictures of the two men in an array containing photographs of a total of twelve black males, only three of whom wore their hair in dreadlocks. The only two men who had beards, mustaches and dreadlocks were the defendant and Crosswell. About two and one-half months after the incident, Hutchinson and Smith chose the photographs of the defendant and Crosswell as those of their assailants. Hester was able to identify only the defendant from the photographic array.[7] Each identification was made in the absence of the other witnesses, and none were told whether the others had selected any photograph from the array.

Before trial, the defendant moved to suppress the identifications made from the photographic array and

---

[7] The detective who testified at the suppression hearing did not believe that any of the other victims had been asked to view the photographic array, and he could not recall whether he had shown the array to anyone who had failed to make an identification.

any subsequent in-court identifications. After a hearing the trial court denied the motion, finding that, although the identification procedure used was unnecessarily suggestive in that only three individuals, two of them the defendants, could reasonably be said to fit the description given by the victims, the identifications were nevertheless reliable under the totality of the circumstances. The defendant took exception to the court's ruling.

To determine whether a pretrial identification procedure, such as the photographic array in this case, violated a defendant's due process rights, "the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980). At issue in this case is the second prong of the above test, since the state has not challenged the trial court's finding with respect to the first prong, that the photographic array was unnecessarily suggestive. To determine whether an identification resulting from an unduly suggestive procedure is nevertheless reliable, a court must weigh the corrupting effect of the suggestive procedure in light of the following factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Ramsundar,* 204 Conn. 4, 10–11, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987).

Because the *Manson* reliability inquiry contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals " 'clear and manifest error.' " *State* v. *Mitchell,* 204 Conn. 187, 203, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Because the issue of the reliability of an identification involves the constitutional rights of an accused, we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. *State* v. *Gordon,* 185 Conn. 402, 416, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); see *Culombe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).

We turn to a review of the record to determine whether the trial court's findings are adequately supported. In deciding that the suggestive photographic array had not corrupted the overall reliability of the identifications, the trial court noted that the witnesses had had a good opportunity to view the assailants at close range for a period of thirty-five to forty-five minutes, that their prior descriptions of the assailants accurately described the defendant and Crosswell, that they had displayed a high level of certainty upon identifying the defendant and that the two and one-half months that had transpired between the commission of the crimes and the photographic array identifications was a relatively short period of time. The record supports the court's findings that the witnesses closely observed their assailants for thirty-five to forty-five minutes, that their prior descriptions matched the

characteristics of the defendant and that they did not hesitate in selecting the defendant's photograph from the array.[8] Moreover, the trial court was correct in concluding that the two and one-half month hiatus between the commission of the crimes and the identifications was not so lengthy that it rendered the identifications unreliable. See *State* v. *Parker*, 197 Conn. 595, 600, 500 A.2d 551 (1985) (dictum indicating that an identification made ten months after the commission of the crime was reliable).

The defendant contends that the identifications were unreliable in spite of the trial court's findings because, due to the victims' fright at being threatened at gunpoint, they probably focused more intently on the locus of the gun than on the physical appearance of the intruders. Although it is possible that the victims' concentration on the features of their assailants was compromised because of the stress of the violent surrounding circumstances, such a possibility did not require exclusion of the identifications. Whether the victims' terror rendered the identifications of the defendant of little or no value was a question properly left to the jury's determination, after it had heard the cross-examination of the victims on that issue. *State* v. *Perez*, 198 Conn. 68, 76–77, 502 A.2d 368 (1985). Because the record adequately supports the trial court's findings regarding the reliability of the identifications of the defendant and because none of the weaknesses

---

[8] The defendant claims that the descriptions given by the victims, although accurate, were too general to be considered reliable. We do not agree with this assertion. Not only were the victims' descriptions of the general characteristics of the defendant, such as height, weight, race and facial hair, accurate, as the defendant admits, but they also included a reference to a specific and distinctive hairstyle known as dreadlocks. Such a description is sufficiently specific to justify admission of the identification testimony. The degree of specificity of a prior description is, rather, a factor for the trier of fact to consider in determining how much weight to assign to such an identification.

claimed by the defendant are so substantial as to require outright exclusion of the identifications, we decline to disturb the trial court's decision denying the motion to suppress the identifications.

## II

The defendant next claims that his rights to due process of law, to confront witnesses against him, to compulsory process and to present a defense, guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution, were violated when the trial court refused to allow him access to certain privileged psychiatric and juvenile court records pertaining to Charlyene Holmes, who testified for the prosecution against the defendant and Crosswell. We believe the trial court acted properly in denying the defendant access to both sets of records and, therefore, conclude that the defendant's constitutional rights were not abridged.

## A

We first address the issue of whether the defendant was entitled to access to Holmes' psychiatric records for the purpose of impeaching her credibility. The issue arose in the following context. Holmes testified for the state, providing a detailed description of the crimes committed and identifying the defendant as one of the perpetrators. She was cross-examined by the defendant, principally about her desire to obtain a favorable sentence in exchange for her testimony, about her felony convictions, and about her former romantic relationship with the defendant, with whom she had had a child. After Holmes had been excused, defense counsel represented to the trial court that he had recently learned of certain records relating to in-patient psychiatric treatment Holmes had received at the Cedarcrest Regional Hospital in Newington and that he had

subpoenaed those records. He then sought to question Holmes on the basis of what was contained in the records. Holmes waived her privilege with respect to the records so that the trial court could conduct an in camera inspection to ascertain whether the records contained information material to her reliability as a witness.[9] After inspecting the records, the court stated that "there is nothing in these records that remotely relate[s] to the witness' capacity to testify, to her credibility, [or to] any facts bearing on her reliability or sense of perception, and in short, they have no probative value . . . as to her ability to relate the truth or to observe or recollect and narrate relevant occurrences." The records were then sealed for possible appellate review, and defense counsel reserved the right to challenge the court's ruling.

A well established procedure exists for determining whether a defendant should be granted access to the psychiatric records of a witness. "If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that 'there is a reasonable ground to believe' that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken. . . .

"Upon inspecting the records in camera, the trial court must determine whether the records are espe-

---

[9] Such psychiatric records are privileged pursuant to General Statutes § 52-146e.

cially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Citations omitted.) *State* v. *D'Ambrosio,* 212 Conn. 50, 58–59, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); *State* v. *McMurray,* 217 Conn. 243, 257–58, 585 A.2d 677 (1991).

Our review of the psychiatric records at issue leads us to conclude that the trial court did not abuse its discretion in denying the defendant access to them because they do not contain information that is especially probative of Holmes' "ability to comprehend, know or correctly relate the truth . . . ." *State* v. *D'Ambrosio,* supra, 58. We are convinced that nothing in the Cedarcrest records would have added weight to the defendant's thorough cross-examination of Holmes and that the trial court properly exercised its discretion in denying the defendant access to those privileged records.

## B

After the trial court had issued its ruling on the disclosure of the psychiatric records, it permitted the defendant to recall Holmes as a witness. Holmes testified that she did at times use cocaine, contradicting testimony she had given earlier. She stated that she had smoked cocaine during the week prior to the com-

mission of the crimes and, on occasion, over a period of seven to eight years, whenever she was in the company of the defendant. Defense counsel then began to inquire about the child Holmes had had with the defendant. When the state objected to a question concerning the whereabouts of the child, defense counsel stated that he was seeking to demonstrate that Holmes felt animosity toward the defendant at the time the crimes were committed. After the jury was excused, Holmes testified that she had placed the child in the temporary custody of the department of children and youth services (DCYS), that DCYS had extended the period of its care for the child and that the child was a ward of DCYS when the crimes were committed. When asked by the court how such evidence would tend to establish animosity between the defendant and Holmes, defense counsel replied that he suspected that DCYS had removed the child from Holmes' custody because of her cocaine abuse and that, since Holmes had testified that she only used drugs when she was around the defendant, she may have blamed the defendant for the loss of custody of her child. The trial court ruled that the entire line of inquiry was irrelevant. The defendant took an exception.

The defendant then moved for an in camera inspection by the trial court of juvenile court records pertaining to neglect proceedings involving DCYS, Holmes and the child, claiming that they might contain information bearing upon Holmes' credibility.[10] He renewed his argument that a connection between Holmes' drug abuse and the removal of the child by DCYS would have motivated her to fabricate testimony against the defendant since she might have associated using drugs,

[10] Juvenile court records pertaining to neglect proceedings and encompassing information from DCYS are confidential and subject to disclosure to third parties only upon court order. General Statutes §§ 17a-24 and 46b-124.

and her subsequent loss of the child, with being in his presence. The trial court rejected this argument and refused to conduct an in camera inspection of the juvenile court records. The defendant took an exception to the ruling.

"We have found error in the refusal of a trial court to examine documents in camera where a sufficient foundation has been laid to indicate a reasonable likelihood that they contain material relevant to the case or useful for impeachment of a witness. *State* v. *Hufford,* 205 Conn. 386, 404–405, 533 A.2d 866 (1987); *State* v. *Januszewski,* 182 Conn. 142, 172–74, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981)." *State* v. *James,* 211 Conn. 555, 579, 560 A.2d 426 (1989). In this case the defendant made no showing that the records might contain anything relevant to the case or to the credibility of Holmes. He attempted to formulate a motive for Holmes to falsify her testimony by hypothesizing that she might have blamed the defendant, in whose presence she had used cocaine, for the commitment of their child to DCYS on account of her drug usage. Any correlation between these events and the credibility of Holmes was extremely attenuated. Even if the juvenile court records had revealed that the child was removed by DCYS because Holmes was abusing drugs, that fact has little or no relevance to the question of whether Holmes had a motive to incriminate the defendant falsely. The trial court, therefore, did not abuse its discretion when it refused to examine the juvenile court records because the defendant in this case failed to lay a sufficient foundation for the belief that the records likely contained relevant impeachment material. Id.

## III

The defendant claims, finally, that his convictions of both conspiracy to commit robbery in the first degree

and conspiracy to commit burglary in the first degree violate the prohibition against double jeopardy contained in the fifth amendment to the United States constitution and article first, § 8 of the Connecticut constitution.[11] The state agrees, as do we, that the defendant's constitutional protection against double jeopardy was violated by the existence of the two conspiracy convictions.[12]

The double jeopardy clause of the fifth amendment to the United States constitution, which was made applicable to the states in *Benton* v. *Maryland,* 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969), provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." This provision has been regarded as serving three separate functions: "[1] It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]." *North Carolina* v. *Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *State* v. *Lonergan,* 213 Conn. 74, 78–79, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990). The defendant's claim that he was unconstitutionally convicted of two counts of conspiracy arising out of a

[11] Although the Connecticut constitution does not contain a specific provision regarding double jeopardy, the common law rule against double jeopardy has been adopted as necessary to the due process guaranteed by article first, § 8. *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).

[12] Although this double jeopardy claim was not preserved at trial, this court has held that such a claim arising in the context of a single trial is nonetheless reviewable. *State* v. *Chicano,* 216 Conn. 699, 705, 584 A.2d 425 (1990), cert. denied, U.S. , 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *State* v. *Snook,* 210 Conn. 244, 263, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); *State* v. *Devino,* 195 Conn. 70, 73, 485 A.2d 1302 (1985); see also *State* v. *Golding,* 213 Conn. 233, 238–42, 567 A.2d 823 (1989).

single unlawful agreement implicates the third aspect of double jeopardy protection.

In a substitute information, the state charged the defendant, in one count, with having agreed with Crosswell and Holmes at a certain time and place to commit robbery and, in a separate count, with having agreed with Crosswell and Holmes at the same time and place to commit burglary. In essence, the state charged the defendant with having entered into a single unlawful agreement to accomplish two criminal purposes. "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed." *Braverman* v. *United States,* 317 U.S. 49, 53–54, 63 S. Ct. 99, 87 L. Ed. 23 (1942); see also *State* v. *Hayes,* 127 Conn. 543, 18 A.2d 895 (1941); *State* v. *Kitt,* 8 Conn. App. 478, 489–90, 513 A.2d 731 (1986), cert. denied, 202 Conn. 801, 518 A.2d 648 (1987). Accordingly, the defendant's convictions for two separate conspiracies cannot stand.

Although the parties agree that a double jeopardy violation has occurred, they disagree about what the appropriate order of remand should be to remedy that violation. The defendant argues that we should remand the case to the trial court with direction that it exercise its discretion to render judgment and sentence on only one conspiracy conviction. The state maintains that the trial court should be directed to combine the two conspiracy convictions and to vacate the sentence

for one of them.[13] The only practical difference between these two dispositions is that, under the state's theory, if the remaining conspiracy conviction were later invalidated upon collateral attack for a reason not affecting the merged conspiracy conviction, that unaffected conviction would be resuscitated and the defendant punished for it. If we were to adopt the defendant's proposal and the remaining conspiracy conviction were somehow invalidated, no other conviction would remain to be resuscitated, and, therefore, the defendant could not be punished for the conviction previously vacated. We considered this question quite thoroughly in *State v. Chicano,* 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, U.S. , 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), and decided to adopt the approach advocated by the state. We perceive no reason to undertake a reconsideration of our reasoning in *Chicano,* particularly in light of the fact that the defendant has not requested that we do so.

The judgment is reversed in part and the case is remanded to the trial court with direction to combine the defendant's two conspiracy convictions and to vacate the sentence for one of the conspiracy convictions.

In this opinion CALLAHAN, COVELLO and BORDEN, Js., concurred.

BERDON, J., concurring. While I agree with the majority that double jeopardy bars one of the two conspiracy convictions, I disagree with the procedure ordered on remand. Before this court's holding in *State v. Chicano,* 216 Conn. 699, 584 A.2d 425 (1990), cert.

---

[13] Adoption of either view will not affect the twenty-three year total effective sentence of the defendant because the trial court ordered the sentences on both conspiracy convictions to run concurrently with the eighteen year sentence on the robbery conviction.

denied, U.S. , 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), a successful double jeopardy claim on appeal resulted in an order to remand the case to the trial court with direction to vacate *both* the impermissible sentence and the impermissible conviction. *State* v. *John,* 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Rawls,* 198 Conn. 111, 502 A.2d 374 (1985); *State* v. *Amaral,* 179 Conn. 239, 425 A.2d 1293 (1979); *State* v. *Goldson,* 178 Conn. 422, 423 A.2d 114 (1979); *State* v. *Napoleon,* 12 Conn. App. 274, 530 A.2d 634, cert. denied, 205 Conn. 809, 532 A.2d 78 (1987); *State* v. *Stellato,* 10 Conn. App. 447, 523 A.2d 1345 (1987).

In *Chicano,* however, we adopted the remand procedure used by the United States Court of Appeals for the Second Circuit, whereby the trial court is directed to vacate only the sentence imposed for the impermissible conviction and leave the judgment of conviction intact by merging or combining it with the remaining conviction. *State* v. *Chicano,* supra, 725. The procedure was changed so that if the permissible conviction or sentence were invalidated later by collateral attack, then the impermissible conviction would be resuscitated and the defendant could be punished for that conviction rather than escaping all criminal liability. Id., 723. The rationale behind combining or merging the two convictions is to prevent the use of the impermissible conviction for any purpose except resuscitation. Id., 724.

I believe that *Chicano* was wrongly decided for the reasons expressed by the Appellate Court when it rejected the Second Circuit's method in *Napoleon.* The Appellate Court agreed with the United States Supreme Court's rationale in *Ball* v. *United States,* 470 U.S. 856, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985), and recognized that keeping both convictions on the defendant's record could have " 'potential adverse collateral

consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a further offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction. . . . Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.' . . ." (Citations omitted.) *State* v. *Napoleon,* supra, 280, quoting *Ball* v. *United States,* supra, 865.

The defendant has not requested that we reconsider *Chicano*; therefore, I concur in the result.