STATE OF CONNECTICUT *v.* TERRANCE ELSEY
(AC 22989)

Schaller, West and Mihalakos, Js.

Argued November 17, 2003—officially released March 2, 2004

*Richard S. Cramer*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Louis J. Luba, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Terrance Elsey, appeals from the judgment of conviction, rendered after a jury trial, of arson in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-111 (a) (1), conspiracy to commit arson in the first degree in violation of General Statutes §§ 53a-48 and 53a-111 (a) (1), two counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1) and (4), two counts of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1) and (4), and three counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63. On appeal, the defendant claims that (1) there was insufficient evidence to support the conviction, (2) the prosecutor committed prejudicial misconduct in closing arguments, and (3) the defendant's rights to be free of double jeopardy were violated by the separate sentences for his conviction of the three conspiracy counts. We conclude

that there was sufficient evidence, that there was no prosecutorial misconduct and that the defendant's rights to be free of double jeopardy were violated. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following facts were adduced at trial. On January 12, 2000, three people were residing in a house in New Britain. At about 12:30 a.m., the occupants heard numerous gunshots. Several bullets entered the house through the windows and the walls. Some of the bullets entered a living room, where one of the victims, a young man, was watching television. The young man dove to the floor and told the other victims to call the police. One of the other victims called the New Britain police.

The sound of the gunshots alarmed other people in the neighborhood and caused them to look out the windows in their homes. A woman living next door to the victims' house looked out her window and observed a small fire burning on the side of the victims' house. The fire, located at the ground level, was approximately five feet wide and one foot tall. It died out on its own within a few minutes but caused minor damage to the house. In addition to surprising the woman, the gunshots startled two men in the house across the street from the victims' house. The two men saw two or three unidentified men near the victims' house and called the police. The men in the house then observed the unidentified men run to a black Pontiac Grand Am car. Both of the men in the house noted that the unidentified man who got into the backseat of the car was wearing a flannel shirt with a white pattern. The car left the scene, and the men in the house were unable to determine if there was a license plate on the car.

Minutes after the gunfire, a Newington police officer saw a black Pontiac Grand Am car without a rear license plate heading northbound on the Berlin Turnpike. The

officer stopped the car and noticed that there were three men inside. The man in the rear seat was wearing eyeglasses and a white or light colored shirt. The officer was aware, via a Newington police broadcast, of the earlier shooting in New Britain. The officer spoke to the driver of the car, who claimed that he had no identification. He was able to provide only the rental agreement for the car. The driver explained that he had just come from the New Britain area. The officer suspected that the men in the car were associated with the shootings and fire, but before the officer could conduct further investigation, the car sped off. The officer gave chase but was unable to catch up to the car. Two other police cruisers and one state police trooper joined the chase.

The chase, which continued with the police vehicles reaching speeds of 100 miles per hour, ended abruptly when the Pontiac smashed into a concrete wall after turning off an exit in Hartford. The state police trooper was the first to reach the scene and witnessed two men, who had been sitting in the front seats, running away. The man in the backseat, wearing a light colored shirt, left the car and, ignoring the trooper's commands, ran from the scene of the accident. Other local police and state police trooper units arrived on the scene, but despite the presence of a K-9 unit, were unable to locate the three men. The police brought to the accident scene the two men who had witnessed the events at the victims' house. Both men stated that the car at the scene of the accident was the same black Pontiac Grand Am that the unidentified men had entered outside the victims' house.

The police then turned their attention to the car. They learned that Robert Lane had rented the car. Robert Lane is the father of Ahmad Lane, a friend of Ronald Hughes, the defendant's cousin. Inside the car, the police found a pair of wire rimmed eyeglasses, a cell phone registered to the defendant and another cell

phone registered to Hughes. The police also discovered latent fingerprints on the car. The latent fingerprints matched the defendant's known fingerprints for his thumb, and index and middle fingers. In addition, the gasoline cap of the car was missing.

Further investigation of the cell phones revealed that there were at least eight calls made between the defendant's cell phone and Hughes' cell phone between 9:30 and 10:30 p.m. earlier that evening. In addition, there was a call from the defendant's cell phone to a female friend of the defendant at 11:55 p.m., approximately thirty-five minutes before the crimes at issue. The defendant's cell phone account was active, but it was deactivated the day after the incident.

The police also investigated the scene at the victims' house. Near the scene of the fire, the police found a cigarette lighter and a champagne bottle with a burned label and gasoline inside. The police also found five nine millimeter shells, all from the same gun, and a .22 caliber bullet. Inside the victims' house, the police recovered three nine millimeter bullets and two .38 caliber bullets. There were eight bullet holes in the house, which, along with the presence of the two different caliber bullets, led the police to believe that at least two different guns were involved in the shooting.[1]

Twelve days after the shooting, the police searched the defendant's house. The police recovered various paraphernalia related to the defendant's cell phone that was found in the car, a new cell phone, an unfired .22 caliber round, a photograph of the defendant wearing wire rimmed eyeglasses, an empty eyeglass case that fit the recovered eyeglasses, a pair of contact lenses and a blank application for a pistol permit. Notably, there was not another pair of eyeglasses in the defen-

---

[1] Although three different caliber bullets were found at the scene of the crime, only two different caliber bullets were found inside the victims' house.

dant's apartment. The .22 caliber round was the same as the one recovered at the scene of the crimes. A master optician compared the wire rim eyeglasses recovered at the scene of the car crash with the defendant's contact lenses.[2] The master optician testified that "[t]hese particular eyeglass lenses [that were found in the car] do match these contact lenses [that were found in the defendant's apartment]. So, these eyeglasses would work for whoever wears these contact lenses." When asked, "Did anyone other than the person wearing these contact lenses wear these glasses?" the master optician replied, "That would be unlikely because it's a very strong prescription and because they match at that certain level of strength."

The police also learned that the defendant's family and the victims had a previous relationship. A son of one of the victims had lent his car to a friend. That friend used the victim's car to rob Hughes, the defendant's cousin. The next day, the defendant's brother said to a son of one of the victims, "I can't get you, so I know where your mom lives and I'm going there tonight." The son testified that the defendant's brother knew where the mother resided. The defendant was subsequently arrested, tried and convicted. This appeal followed.

I

The defendant claims that there was insufficient evidence to support his conviction. The state argues that all of the evidence, as previously set forth, allowed the jury to make a series of reasonable inferences that led to the conclusion that the defendant was guilty.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two

[2] A master optician is an optician who has passed a national test and written a paper relating to optometry. There are six master opticians in Connecticut.

part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Bermudez*, 79 Conn. App. 275, 280, 830 A.2d 288, cert. granted on other grounds, 266 Conn. 921, 835 A.2d 61 (2003).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 139, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003); see also *State* v. *Haggood*, 36 Conn. App. 753, 761, 653 A.2d 216 (jury may draw inferences from facts gleaned from other inferences), cert. denied, 233 Conn. 904, 657 A.2d 644 (1995).

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always

*easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable.* But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Emphasis added; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 93, 836 A.2d 224 (2003); see also *State* v. *Niemeyer*, 258 Conn. 510, 518, 782 A.2d 658 (2001) (applying standard in sufficiency of evidence claim).

It is easiest to illustrate the chain of inferences the jury reasonably could have made by working backward from the scene of the crash to the events at the victim's house. The jury reasonably could have found that the defendant was in the car at the time of the crash. The defendant's cell phone was found in the car. It had been used to call the defendant's female friend within thirty-five minutes of the crime. It was also used to call Hughes several times that evening. Further, the defendant took steps to deactivate the phone the next day, supporting the inference that he was aware that he recently had lost it.[3] Eyeglasses matching the strong prescription for the defendant were also found in the car. Further, the eyeglasses found in the car were similar to the ones

---

[3] That usage of the cell phone supports the inference that the defendant was not only in the car, but was in the car at the relevant time. "Jurors do not live in a fishbowl"; *State* v. *Torrence*, 37 Conn. App. 482, 486, 657 A.2d 654 (1995); and "[c]ommon sense does not take flight at the courthouse door." *State* v. *Rivera*, 74 Conn. App. 129, 138, 810 A.2d 824 (2002). Thus, the jury reasonably could have inferred that it was the defendant himself who had called his female friend.

worn by the defendant in the photograph recovered at his apartment. In addition, the defendant's fingerprints were found on the car, which was a rental car.[4] The jury reasonably could have inferred that because the car was rented, the defendant did not have the chance to leave his fingerprints and various personal items in the car before the incident. That fact, in combination with the timing of the phone calls, supported the inference that the defendant was in the car at the time of the crash.

The jury also reasonably could have found that the car that crashed in Hartford was the same car that was at the scene of the crimes in New Britain. The two men who witnessed the incident at the victims' house identified the car at the crash scene as being the same one they had seen in New Britain. Further, the jury heard evidence that there was an unidentified man with a white or light colored shirt. That unidentified man was seen at the victims' house, at the first traffic stop by the Newington police officer and at the scene of the car crash.

As the jury could have inferred that the defendant was at the victims' house, through a combination of the evidence previously set forth, it could have inferred that he was guilty of the crimes. The jury could have based those inferences on the following facts: The defendant was found in possession of a bullet of the same caliber that was found at the victims' house; there were at least two guns used in the shooting; the defendant and the others fled the scene of the crimes, which was indicative of consciousness of guilt; see *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001)

---

[4] The defendant did not offer any evidence that he had previous contact with the car prior to the night of the incident. The defendant did not have the burden of proving himself innocent, of course, but without an alternative explanation for the presence of his fingerprints on a rental car, the jury was left with the state's theory of the case.

(" '[f]light, when unexplained, tends to prove a consciousness of guilt' "); and the defendant had a motive, which was to seek revenge for the robbery of his cousin. Further, although there was less evidence to link the defendant to the arson, the jury could have reasonably inferred that he was "fully aware of the unlawful purpose of [his] companions and . . . [i]n the event of resistance, the [defendant was] ready to render assistance to those actually committing the [crime] and to aid them in making a speedy escape." *State* v. *Pundy*, 147 Conn. 7, 12, 156 A.2d 193 (1959). In addition, the jury could have based at least part of its decision regarding the conspiracy charges on the defendant's decision to come to the scene of the crime with the coconspirators, stay at the scene while the crimes were committed and leave the scene with the coconspirators. See *State* v. *Smith*, 15 Conn. App. 122, 126, 543 A.2d 301, cert. denied, 209 Conn. 805, 548 A.2d 441 (1988); see also *State* v. *Fuller*, 58 Conn. App. 567, 575, 754 A.2d 207 (jury may infer intent from failure to summon assistance), cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000). Thus, the jury could have found beyond a reasonable doubt from the inferences reasonably drawn from the evidence that the defendant was guilty of the charged crimes.

Further, as the defendant was charged as an accessory to the arson, the jury reasonably could have inferred that the other unidentified men had taken part in the arson. See General Statutes § 53a-8. It was reasonable to infer that the group that had shot at the house would also try to inflict some other type of damage. Further, the jury heard evidence that the gasoline cap on the car was missing and that the champagne bottle, which was recovered near the scene of the fire, contained gasoline. As the jury could have inferred that the same car had been at the crash and at the victims' house, the jury could then properly base a second infer-

ence, that the shooter had committed the arson, on the absence of the gasoline cap and the presence of gasoline in the champagne bottle. See *State* v. *Haggood*, supra, 36 Conn. App. 761.

After construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found the defendant guilty beyond a reasonable doubt.

## II

The defendant also claims that the prosecutor committed prejudicial misconduct during closing arguments. The defendant argues that "[a]lthough no single statement of the prosecutor by itself constituted misconduct, the cumulative effect denied the defendant a fair trial." We disagree.

Additional facts are necessary for the resolution of the defendant's claim. During closing argument, the prosecutor made the following statements: "Mr. Robert Lane, the father of Ahmad Lane, who was one of the friends of [the defendant], rented the motor vehicle"; "[b]ut this car is found with the gas door opened. Why? Think about that. Link it back up to [the victims' house]. The bottle full of gasoline found at the scene"; and, "Look at the glasses. Then, it's just a coincidence that contacts were seized from his house. Again, no glasses, but contacts were seized from his house when the master optician stated that only the person that wears these contacts could wear these glasses." The defendant objected to the first statement, but not to the second or third statements. We will address the first statement separately from the second and third statements.

## A

When reviewing a claim of prosecutorial misconduct, the threshold issue is whether the actions challenged by the defendant constituted misconduct. "A prosecu-

tor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 306, 755 A.2d 868 (2000); see also *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003). "In argument before the jury, counsel may comment upon facts properly in evidence and upon reasonable inferences drawn therefrom." *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977). "The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial." (Internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 298, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001).

If the matters alluded to in the prosecutor's statement were within the record, or were reasonable inferences drawn therefrom, the statement was not improper. Cf. *State* v. *Singh*, 259 Conn. 693, 716 n.22, 793 A.2d 226 (2002) (statement of prosecutor not supported by record held proper if it is matter of " 'common public knowledge based on ordinary human experience' ").

The prosecutor stated that Ahmad Lane was a friend of the defendant. The evidence on that point came from Wayne Stephens, a relative of the victims. Stephens was familiar with the defendant because they had grown up together and associated with the same people. Stephens was also familiar with Hughes and Ahmad Lane. Stephens testified that Ahmad Lane "hangs with" Hughes. The prosecutor's statement that the defendant was friendly with Lane was a reasonable inference that was based on the evidence that the defendant and Hughes were close to each other and that Hughes "hangs with"

Lane. The term friend is broad, and we will not automatically infer that the prosecutor intended the remark to mean that they were close, personal friends. See *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) (reviewing court should not lightly assume every statement has its most potentially damaging meaning). That statement was a reasonable inference from the evidence. Therefore, it was not improper, and there was no prosecutorial misconduct.

B

The defendant seeks review of the second and third statements under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "[W]e have long held that [*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial." *State* v. *Somerville*, 214 Conn. 378, 393, 572 A.2d 944 (1990); see *State* v. *Rogers*, 50 Conn. App. 467, 477, 718 A.2d 985 (" '[w]e will not afford *Golding* review to [unpreserved] claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial' "), cert. denied, 247 Conn. 942, 723 A.2d 319 (1998); see also *State* v. *Young*, 29 Conn. App. 754, 766, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993). The second and third comments made by the prosecutor, relating to the quantity of liquid in the champagne bottle and the relationship between the contacts and eyeglasses, were neither blatantly egregious nor were they part of a larger pattern of misconduct.[5] Therefore, we decline to review

---

[5] It is not even clear that the statements were not reasonable extrapolations from the evidence presented, for "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly* v. *DeChristoforo*, supra, 416 U.S. 647.

that part of the defendant's claim. See *State* v. *Somerville*, supra, 393 (declining review when remarks by prosecutor were isolated, brief).

### III

The defendant's final claim is that his rights to be free of double jeopardy were violated by his separate sentences for the conviction of the three conspiracy counts.[6] The defendant argues that we should remand the case to the trial court with direction to set aside the conviction of two of the three conspiracy counts. The state concedes that the defendant's rights were violated, but argues that the proper remedy is to remand the case to the trial court with direction to combine the conviction of the three counts and to vacate the sentences on two of them.

"The courts of this state have long held that [t]he gist of the offense of conspiracy is the unlawful combination and not the accomplishment of an objective or objectives, whether lawful or unlawful. . . . Whether the information charges that the combination was formed to accomplish one or many objectives is immaterial. A combination to commit several crimes is a single offence [sic]. . . . No matter how many violations of law may be concerted by the confederates, if the concert takes place at one time, the crime is single." (Internal quotation marks omitted.) *State* v. *Kitt*, 8 Conn. App. 478, 489–90, 513 A.2d 731, cert. denied, 202 Conn. 801, 518 A.2d 648 (1986).

---

[6] The defendant claims that his rights to be free of double jeopardy under the fifth amendment to the United States constitution and article first, § 9, of the Connecticut constitution were violated. We note that "[a]lthough the Connecticut constitution does not contain a specific provision regarding double jeopardy, the common law rule against double jeopardy has been adopted as necessary to the due process guaranteed by article first, § 8." *State* v. *Howard*, 221 Conn. 447, 461 n.11, 604 A.2d 1294 (1992). We address the defendant's claim as though it were raised under article first, § 8, rather than under § 9.

The defendant's suggestion to set aside the conviction on two of the three conspiracy counts is without merit. Our Supreme Court *already* has explained the appropriate remedy in *State* v. *Howard*, 221 Conn. 447, 604 A.2d 1294 (1992). The *Howard* court stated that "[a]lthough the parties agree that a double jeopardy violation has occurred, they disagree about what the appropriate order of remand should be to remedy that violation. The defendant argues that we should remand the case to the trial court with direction that it exercise its discretion to render judgment and sentence on only one conspiracy conviction. The state maintains that the trial court should be directed to combine the two conspiracy convictions and to vacate the sentence for one of them. The only practical difference between these two dispositions is that, under the state's theory, if the remaining conspiracy conviction were later invalidated upon collateral attack for a reason not affecting the merged conspiracy conviction, that unaffected conviction would be resuscitated and the defendant punished for it. If we were to adopt the defendant's proposal and the remaining conspiracy conviction were somehow invalidated, no other conviction would remain to be resuscitated, and, therefore, the defendant could not be punished for the conviction previously vacated. We considered this question quite thoroughly in *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied. 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), and decided to adopt the approach advocated by the state." *State* v. *Howard*, supra, 462–63. We hold that the defendant's rights to be free of double jeopardy were violated and that the appropriate remedy is to remand the case to the trial court with direction to combine the conviction on the three conspiracy counts and to vacate the sentences on two of them.

The judgment is reversed in part and the case is remanded with direction to combine the conspiracy

convictions and for resentencing. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.