STATE OF CONNECTICUT *v.* KELVIN SANCHEZ
(AC 24282)

Lavery, C. J., and Schaller and Stoughton, Js.

Sanchez guilty of conspiracy to commit murder. After the jury failed to reach a verdict as to Fernandez, the court declared a mistrial.

[3] The defendant conceded at oral argument that he was challenging only his conviction of conspiracy to commit murder.

Argued January 10—officially released October 25, 2005

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Cornelius P. Kelly,* senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Kelvin Sanchez, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a). On appeal, the defendant claims that the trial court improperly (1) rendered judgment of conviction because the evidence was insufficient to support his conviction and (2) instructed the jury on the conspiracy to commit murder charge in a manner that violated his due process rights.[1] We reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the defendant's appeal. The state charged the defendant in a substitute information with murder in violation of General Statutes § 53a-54a (a), attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a (a), and conspiracy to attempt to commit murder in violation of General Statutes §§ 53a-48, 53a-49 and 53a-54a (a). The state also charged Xavier Rivera, Sigfredo DeJesus, Wilfredo Fernandez and Jose Vasquez with the same crimes. All five defendants were tried together.[2]

---

[1] The defendant also claims that his conviction is legally impossible due to the jury's verdicts regarding his codefendants. Because we conclude that the defendant's second claim warrants reversal of both his and his codefendants' convictions of conspiracy to commit murder, we need not address that claim. See *State* v. *DeJesus,* 92 Conn. App. 92, 883 A.2d 813 (2005).

[2] The court subsequently acquitted Vasquez of all counts, and acquitted the defendant and Fernandez of the first and second counts. The jury found Rivera guilty of attempt to commit murder and conspiracy to commit murder. The jury also found the defendant guilty of conspiracy to commit murder. After the jury failed to reach a verdict as to Fernandez, the court declared a mistrial.

The jury reasonably could have found the following facts. During the late afternoon of October 8, 1999, the victim, Cesar Rivera, and Luis Romero were driving a red Ford Explorer around Bridgeport. During the evening, they picked up additional passengers and planned to go to a nightclub. At approximately 11 p.m., while Romero was driving on Park Terrace, they encountered a taxicab that had stopped in the street, blocking their way. Romero, who had smoked the drug PCP that day, became agitated and demanded that the taxicab driver "[g]et the fuck out of the way." Romero caused a disturbance on the street by yelling, swearing and sounding the vehicle's horn during the exchange with the taxicab driver. When the taxicab finally moved out of the way, Romero continued along the street to where Xavier Rivera was in the process of parking a car. Romero then addressed Xavier Rivera, stating, "Yeah, I'm talking to you, too." An argument ensued between Romero and Xavier Rivera. Several people who had been sitting on the porch of a residence entered the street and began yelling at Romero during the incident. Someone threw a forty ounce beer bottle, shattering the rear window of the Explorer. Seconds later, someone in the street fired five gunshots. One bullet hit the rear of the Explorer as Romero drove away. Prior to that incident, the defendant, DeJesus and Fernandez had been seen on the porch of a residence located on the street.

Shortly after that incident, at approximately 11:30 p.m., the victim's sister, Leticia Rivera, was approached by the defendant and Fernandez as she left her apartment in Marina Village, a housing project in Bridgeport. The defendant questioned her regarding her brother's whereabouts, explaining that the victim had been with "his boy" who had been "talking shit . . . ." The defendant stated, "[W]e're not having that shit." Leticia Rivera testified that she saw the defendant holding a gun during the encounter, that he pointed the gun at her friend

who had arrived in a car and that he opened the car door to determine whether "the guys he was looking for" were inside. When she entered her apartment to try to page the victim, the defendant and Fernandez followed her inside. Later, she drove around the area, but failed to find the victim.

Yamil Lopez, who also lived at Marina Village, testified that at approximately 11:30 p.m., she heard Xavier Rivera knock on the door of a nearby residence. When Vasquez answered the door, Xavier Rivera told him that he had argued with "Cesar's boy" and that he and his "boys" were going to wait for the victim. Lopez also testified that at approximately 12:30 a.m. on the morning of October 9, 1999, she heard cars approach in front of her residence and recognized the voices of the defendant, Xavier Rivera, DeJesus and Fernandez. She heard both DeJesus and Xavier Rivera say, "[L]et's go to Cesar's mother's house." The victim lived with his mother in another residence in Marina Village. Lopez heard the group walking around her building and then saw all four of them walking on a path between the buildings. She then heard the defendant say, "[N]o, I already spoke to his sister. Let's just wait in front of the building." She also heard the defendant say, "[L]et's leave." Lopez testified that after two or three minutes, the group returned to the front of the building and that she heard them talking, screaming and throwing bottles for sixty to ninety minutes. Then she heard the voices of the defendant, Xavier Rivera, DeJesus and Fernandez "calling and screaming," and saying things like, "[T]here they go," and, "[C]ome here." When a car approached, Lopez heard DeJesus say, "[G]et out of the car." Then she heard several gunshots.

Romero testified that after the incident on Park Terrace, he drove the Explorer to a club. Later, he and the victim left the other members of their party and drove around. At approximately 2:40 a.m. on the morning of

October 9, 1999, the victim drove the Explorer to Marina Village. When they arrived, between three and five people approached their vehicle, and one of them tried to pull the victim out of the driver's side window. From the passenger side, Romero managed to reach the gear shift to shift the Explorer in reverse and to step on the accelerator. As soon as the car started moving, one or more persons fired several gunshots. The vehicle traveled into the street, over the median and came to a stop on the opposite side of the street in front of a row of stores. Both Romero and the victim exited the vehicle, Romero from the passenger side and the victim from the driver's side. As Romero ran away, he heard more gunshots. Later, while hiding in a construction site, he saw a dark vehicle pass by him and then a man with a gun.

Joseph Szor, a Bridgeport police officer working as a private guard at a nearby construction site, radioed police dispatch to report gunshots. Ninety seconds after hearing the gunshots, Szor saw a dark vehicle leaving the area at a high rate of speed. Szor and other police officers who had been dispatched to the scene found the Explorer that the victim and Romero had been driving. The windows were shattered, the transmission was locked in reverse and bullet holes were evident. The officers also found the body of the victim lying next to a dumpster outside one of the stores. It was later determined that the victim had died from bullet wounds. Police officers investigating the incident found physical evidence indicating that a total of twenty-eight bullets had been fired from three different firearms. Additional facts will be set forth as necessary.

I

The defendant claims that the evidence was insufficient to support his conviction of conspiracy to commit

murder.[3] Specifically, the defendant claims that there was no evidence of an agreement between him and any other person to murder Cesar Rivera.[4] We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 270, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). "In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." *State* v. *Conde*, 67 Conn. App. 474, 490, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

To establish the crime of conspiracy to commit murder, the state must show that there was an agreement between two or more persons to cause the death of another person and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. *State* v. *Green*, 261 Conn. 653, 669, 804 A.2d 810 (2002). In addition, the state also must

---

[3] We address the defendant's sufficiency of evidence claim first because that claim, "if successful, would necessitate the entry of a judgment of acquittal . . . ." (Citation omitted.) *State* v. *Murray*, 254 Conn. 472, 478, 757 A.2d 578 (2000).

[4] The defendant preserved the issue by moving for a judgment of acquittal after the state presented its case, after the defense rested and after the judgment of conviction.

show that the conspirators intended to cause the death of another person. *State* v. *Bell*, 68 Conn. App. 660, 669, 792 A.2d 891, cert. denied, 260 Conn. 921, 797 A.2d 518 (2002).

"The existence of a formal agreement between the parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Citations omitted; internal quotation marks omitted.) *State* v. *Crump*, 43 Conn. App. 252, 258, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996). Simply put, the "requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Internal quotation marks omitted.) *State* v. *Davis*, 68 Conn. App. 794, 799, 793 A.2d 1151, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002).

"It is the jury's function to draw whatever inferences it deems reasonable and logical. . . . The jury, however, may not pluck these inferences from the ether. There must be sufficient evidence to support the inferences, otherwise they are not *reasonable* inferences and cannot support a conviction. . . . Once an inference has been reasonably found, it can be used as the basis for further inference." (Citations omitted; emphasis in original.) *State* v. *Smith*, 36 Conn. App. 483, 487, 651 A.2d 744 (1994) (reviewing sufficiency of evidence claim in appeal from conspiracy conviction), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995); see also *State* v. *Estrada*, 28 Conn. App. 416, 422, 612 A.2d 110 (reversing conspiracy to commit murder conviction

where "stacking of reasonable inferences" built on weak evidentiary foundation that failed to establish any semblance of defendant's participation in agreement to engage in criminal activity that was object of conspiracy), cert. denied, 223 Conn. 925, 614 A.2d 828 (1992).

In the companion case of *State* v. *DeJesus*, 92 Conn. App. 92, 104, 883 A.2d 813 (2005), released on the same date as this opinion, we concluded that the conspiracy to commit murder charge was limited to an alleged conspiracy to murder Cesar Rivera. The state, therefore, had the burden of proving that the defendant had agreed with one or more persons to cause the death of Cesar Rivera and that the defendant had the specific intent to cause his death.

The jury heard evidence of the defendant's actions prior to Cesar Rivera's murder. Leticia Rivera testified that shortly after the incident on Park Terrace, the defendant and Fernandez approached her at her apartment, and the defendant asked her, "[W]here's your brother?" and explained that "him and his boy, they're driving a truck, and his boy was talking shit . . . . And me and my clique, we're not having that shit." Leticia Rivera also testified that she saw the defendant holding a gun during that conversation, that he pointed the gun at her friend, who had arrived in a car, and that he opened the car door to determine whether "the guys he was looking for" were inside.

In addition, Yamil Lopez testified that shortly before Cesar Rivera's murder, she heard cars approach in front of her residence, which was near the murder scene, and recognized the voices of the defendant and three codefendants, Xavier Rivera, DeJesus and Fernandez. After she heard DeJesus and Xavier Rivera say, "[L]et's go to Cesar's mother's house," and saw the group walk to the rear of her building on a path, she heard the defendant say, "[N]o, I already spoke to his sister. Let's

just wait in front of the building." Lopez testified that after two or three minutes, the group returned to the front of the building and that she heard them talking, screaming and throwing bottles for sixty to ninety minutes. Then, she heard the voices, including that of the defendant, "calling and screaming," and saying things like, "[T]here they go," and, "[C]ome here." Shortly thereafter, she heard several gunshots. The police later found the victim's body nearby.

The jury also heard evidence regarding the actions of the defendant's codefendants. That evidence included the argument between Xavier Rivera and Romero that had occurred on Park Terrace hours before the murder. In addition, the jury heard evidence that Xavier Rivera had knocked on Vasquez' door and had told him that he had argued with "Cesar's boy" and that he "was getting his other boys . . . because they were going to wait for Cesar."

The defendant contends that those facts were insufficient to establish that he had agreed with anyone to murder Cesar Rivera. We disagree. Construing the evidence in the light most favorable to sustaining the verdict, we conclude that those facts were sufficient to permit the jury reasonably and logically to infer that the defendant had entered into an agreement to cause the death of Cesar Rivera. Contrary to the defendant's argument, the inferences the jury was required to draw in order to establish the defendant's guilt were not built on a weak evidentiary foundation. As discussed, the jury heard testimony regarding the altercation on Park Terrace hours before the shooting, testimony that the defendant was carrying a gun while looking for the victim, and testimony that the defendant had suggested to his codefendants that they wait in the area where the gunshots were later fired and where Cesar Rivera's body subsequently was found. In addition, a witness

testified that she had heard the defendant's voice moments before the shooting started. Although there was no direct evidence that the defendant had agreed with anyone to cause Cesar Rivera's death, we conclude that the required agreement reasonably could be inferred from the separate acts of the defendant and his codefendants, and from the events that preceded the murder. Accordingly, the defendant's claim must fail.

## II

The defendant also claims that the court improperly instructed the jury on the conspiracy to commit murder charge in a manner that violated his due process rights. Specifically, the defendant claims that the court's instruction failed to define properly an essential element of the offense because it did not identify the victim, Cesar Rivera, as the person who was alleged to be the intended object of the conspiracy.[5] We fully addressed and resolved that claim in the companion case of *State* v. *DeJesus*, supra, 92 Conn. App. 107–109; see also *State* v. *Rivera*, 92 Conn. App. 110, 883 A.2d 1257 (2005). In that decision, we concluded that the conspiracy to commit murder charge was limited to an alleged conspiracy to murder Cesar Rivera, and, therefore, the court should have instructed the jury that the state was required to prove that the defendant intended to cause the death of Cesar Rivera. That decision is dispositive of the defendant's claim in this case.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

[5] The defendant also makes the related claims that the court improperly enlarged the conspiracy to commit murder charge by instructing the jury in a manner that permitted conviction of an offense with which he was not charged and that the court's instruction sanctioned a nonunanimous verdict. Because we conclude that reversal is required on different grounds, we need not address those claims.