STATE OF CONNECTICUT *v.* JEROME LEGGETT
(AC 25189)

Lavery, C. J., and Schaller and Gruendel, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued November 17, 2005—officially released March 21, 2006

*David J. Reich*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Thomas R. Garcia*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Jerome Leggett, appeals from the judgment of conviction, rendered after a jury trial, of two counts of robbery in the second degree in violation of General Statutes §§ 53a-135 (a) (2) and 53a-8, and one count of conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-135 (a) (2) and 53a-48 (a). On appeal, the defendant claims that (1) there was insufficient evidence to convict him of (a) conspiracy to commit robbery, (b) robbery of the store clerk and (c) robbery of a customer, and (2) the trial court improperly instructed the jury on (a) the element of intent and (b) *Pinkerton*[1] liability. We disagree and affirm the judgment of the trial court.

---

[1] *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

The jury reasonably could have found the following facts concerning this case, which involves the robbery of a 7-Eleven convenience store on Oakwood Avenue in West Hartford by the defendant, James Arnold[2] and Reginald Sledge.[3] On October 31, 2001, the three men met in Hartford. Arnold and Sledge had previously agreed to commit a robbery that evening[4] and obtained a facsimile of a weapon for use in carrying out their plan.[5] The defendant accompanied one of the men that evening, and all three gathered in Sledge's car.[6] Once together, Arnold asked if Sledge would drive "*them* to go do a score*,*" and Sledge agreed to drive "*them* somewhere to do something.*"* (Emphasis added.)

The three men first obtained some heroin and cocaine, which they mixed and injected.[7] They then

---

[2] Arnold pleaded guilty to one count of robbery in the first degree and one count of robbery in the second degree and received an effective sentence of thirteen years.

[3] Sledge made a plea agreement under which he was sentenced to twelve years for this robbery, which would be suspended after the fifty-four months he was serving at the time of trial on another charge. An additional robbery charge was nolled.

[4] Arnold and Sledge had committed another robbery a few days earlier at a nearby Dunkin' Donuts shop.

[5] The weapon was not an actual gun, but rather a facsimile fashioned to resemble one. The parties disagree as to whether the facsimile weapon was in Sledge's car at the beginning of the evening or whether Arnold obtained it at an abandoned building where the three men went and where Arnold obtained clothing to disguise his appearance for the robbery. It is nevertheless undisputed that the weapon was obtained before the men arrived at the store and that Arnold brandished the facsimile weapon at the time of the robbery.

[6] The precise circumstances that brought the men together are unclear, as Arnold and Sledge testified to different versions. Arnold testified that the defendant already was in Sledge's car when he arrived, and Sledge told him that the defendant was only there to steal cigarettes and did not commit robberies. In contrast, Sledge testified that the defendant accompanied Arnold and that Arnold introduced the defendant as his "kid brother." The jury reasonably could have believed either scenario and still have found the defendant guilty of the charged offenses.

[7] The defendant also may have obtained some crack cocaine after injecting himself with the other drugs.

proceeded to an abandoned building where Arnold obtained some clothing to disguise his appearance for the robbery. He also returned with some vodka, which the three men consumed. While drinking, Arnold asked Sledge what they could do and where could they go. Arnold suggested the 7-Eleven that they ultimately robbed. Once the men arrived in the vicinity of the 7-Eleven, the defendant and Arnold started bickering over whether one of them was going to "blow everything" and whether they should call off their plans. Sledge warned them to "keep a clear head" because there were police around. Sledge then parked his car on a nearby residential street. Arnold and the defendant exited the car and headed in the direction of the 7-Eleven.

At about 1 a.m., Nafiou Salaou was working alone as a clerk at the 7-Eleven. Salaou was near the counter speaking with Donna Zuerblis, the only customer in the store at that time. The defendant entered the 7-Eleven first and started walking around the store. Arnold entered the store next, walked in front of the counter and stood next to Zuerblis.[8] Arnold then took the facsimile of a gun, pointed it at Salaou and ordered that he open the cash register. After getting the money from the register, Arnold ordered Salaou and Zuerblis to lie down on the floor. Immediately after Arnold announced the robbery, at the same time that he was stealing the money, the defendant went behind the counter and took some cigarettes, which he placed in a plastic bag. The defendant then exited the store, returned to the car where Sledge was waiting and informed him that Arnold was still inside the store with the customer. Arnold remained in the store and took money and jewelry from Zuerblis before exiting.

---

[8] A tape from the in-store surveillance camera depicts the two men entering, but their faces cannot be identified from the tape. At trial, Arnold identified the defendant as the first man who entered and himself as the second.

At about the same time the defendant was leaving the store, Sergeant Donald Melanson of the West Hartford police department was on patrol in his marked police cruiser. While driving past the 7-Eleven, Melanson observed the defendant walking away from the store, suspiciously fumbling with the cartons of cigarettes. Melanson then turned his car around to return to the 7-Eleven to investigate. When the defendant and Sledge noticed that a police car was nearby, they departed, leaving Arnold behind at the store.[9] When Melanson returned to the store, he observed a car, without head-lights, driving away from the property. Melanson then approached the door to the store, encountering Arnold. Arnold ignored Melanson, and proceeded toward where the car had been, yelling something to the effect of "don't leave without me." Salaou then told Melanson that Arnold had robbed him at gunpoint. Arnold was apprehended nearby shortly thereafter.

In an amended long form information, the state charged the defendant with two counts of robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-8 (a), and one count of conspiracy to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a). The defendant entered a pro forma plea of not guilty to all counts. Following trial, on September 29, 2003, the jury returned a verdict of guilty on all three counts. The court rendered judgment of conviction in accordance with the jury's verdict and, on December 16, 2003, sentenced the defendant to an effective term of twenty years of incarceration, sus-pended after eight years, followed by five years of pro-bation. This appeal followed.

I

The defendant's first three claims challenge the suffi-ciency of the evidence supporting his conviction on

---

[9] Sledge and the defendant continued to a location in Hartford where they sold the stolen cigarettes and divided the money between themselves. They also discussed the possibility of Arnold's arrest and the potential to free him.

each of the three counts charged in the information. We do not find his arguments persuasive.

We begin by setting forth our standard of review. "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Citation omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 92 Conn. App. 112, 118, 884 A.2d 1, cert. granted on other grounds, 276 Conn. 932, 890 A.2d 573 (2005).

## A

The defendant first claims that there was insufficient evidence for the jury to find him guilty of conspiracy to commit robbery in the second degree under §§ 53a-135 (a) (2) and 53a-48. Specifically, the defendant argues that the state failed to show that he had the intent to agree to commit the robbery and that even if he had the intent to enter the store with Arnold, the state failed to show that he had the intent to use force or threatened force to carry out a larceny. We conclude that there was sufficient evidence for the jury reasonably to have found the defendant guilty of conspiracy to commit robbery in the second degree.

The essential elements of the crime of conspiracy are well established. "To sustain a conviction under § 53a-48 (a),[10] the state needs to prove beyond a reasonable doubt (1) that a defendant intended that conduct constituting a crime be performed, (2) that he agreed with one or more persons to engage in or cause the performance of such conduct and (3) that he or any one of those persons committed an overt act in pursuance of such conspiracy. . . . While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 68 Conn. App. 794, 798–99, 793 A.2d 1151, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002); see also *State* v. *Smith*, 15 Conn. App. 122, 127, 543 A.2d 301 (conspiracy found where defendant arrived with principal, other associates, attempted to distract store owners, left moments before actual theft, attempted to flee with associates), cert. denied, 209 Conn. 805, 548 A.2d 441 (1988).

1

The defendant argues that there is insufficient evidence that he intended to agree to the conspiracy to commit robbery because he expressly disavowed his intent to participate in a robbery. He relies on Arnold's testimony that it was made clear that the defendant

---

[10] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

"only steals, he don't do robberies" and that "[h]e wasn't there to do the robbery, he was going out to steal cigarettes." "[W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005). The jury reasonably could have discredited Arnold's testimony of the defendant's intent to commit only larceny. "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Flowers*, 85 Conn. App. 681, 692, 858 A.2d 827, cert. granted on other grounds, 272 Conn. 910, 863 A.2d 703 (2004).

The defendant further argues that the state failed to prove that he intended to agree with Sledge and Arnold to the conspiracy to commit robbery.[11] The defendant supports his assertion with citations to the record suggesting that he may not have been present for certain conversations between Sledge and Arnold pertaining to plans for the robbery. "A conviction of the crime of conspiracy can be based on circumstantial evidence, for conspiracies, by their very nature, are formed in secret and only rarely can be proved otherwise than by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Smith*, 86 Conn. App. 259, 269, 860 A.2d 801 (2004). Here, the jury was presented with sufficient evidence to find that the defendant agreed to

[11] The defendant also argues that no agreement may be found because an agreement must provide mutual benefit, with each party agreeing to the other's participation. The defendant, however, offers no case law in support of this proposition. Furthermore, the defendant's argument fails under his own definition. The jury reasonably may have inferred that Arnold and Sledge implicitly agreed to the defendant's participation by continuing to carry out the planned robbery at the same time that the defendant was taking cigarettes. We will address the question of whether the defendant aided his coconspirators in our analysis of the evidence on the count of robbery in the second degree with respect to Salaou.

the conspiracy to commit robbery. First, the defendant began the evening with either Arnold or Sledge; see footnote 6; who had previously agreed to commit a robbery that night and provided a facsimile weapon to further that purpose. Second, once all three men were present, Arnold asked if Sledge would drive "*them* to go do a score," and Sledge agreed to drive "*them* somewhere to do something." (Emphasis added.) Third, the defendant was present when Arnold returned with the clothes to disguise his appearance and was also present for a conversation about where to carry out the robbery. Fourth, the defendant exited from the same car as Arnold and Sledge, entered the store immediately before Arnold, and waited until Arnold displayed the facsimile weapon to take the cigarettes. Fifth, the defendant returned to the same car, driven by Sledge, to which Arnold intended to return after the robbery.

"[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Morgan*, supra, 274 Conn. 801. The jury's conclusion that the defendant intended to agree to the conspiracy is reasonable and logical in light of the evidence before it and the inferences that may be drawn therefrom. Cf. *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).[12]

---

[12] In *Elsey*, this court affirmed the defendant's conviction on the conspiracy charge where "the jury could have reasonably inferred that he was fully aware of the unlawful purpose of [his] companions and . . . [i]n the event of resistance, the [defendant was] ready to render assistance to those actually committing the [crime] and to aid them in making a speedy escape. . . . In addition, the jury could have based at least part of its decision regarding the conspiracy charges on the defendant's decision to come to the scene of the crime with the coconspirators, stay at the scene while the crimes

## 2

The defendant next argues that even if there was sufficient evidence to demonstrate that he intended to agree to the conspiracy, the evidence was insufficient to prove that he intended to commit a robbery because he did not intend to use or threaten the use of physical force. "To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 68 Conn. App. 799. Robbery requires that a larceny be committed by the use or threatened use of immediate physical force. General Statutes § 53a-133.[13] "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." General Statutes § 53a-119. The defendant correctly concedes that the evidence "may support a finding that [he] had the intent to commit larceny." We therefore must look only to whether the defendant carried out the larceny through the use or threatened use of physical force.[14]

were committed and leave the scene with the coconspirators." (Citations omitted; internal quotation marks omitted.) *State* v. *Elsey*, supra, 81 Conn. App. 747.

[13] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[14] The defendant argues that the state must prove separately his intent to use or threaten the use of physical force. This construction, however, misinterprets the statute. The larceny component of robbery, as described in General Statutes § 53a-119, is an intent crime. The use or threatened use of force described in General Statutes § 53a-133, however, has no additional intent element. The state, therefore, need only prove that the defendant

"[I]f the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be in the course of the robbery or the attempted robbery within the meaning of the statute." (Internal quotation marks omitted.) *State* v. *Ali*, 92 Conn. App. 427, 438, 886 A.2d 449 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). The record includes evidence that the defendant entered the store first but waited until Arnold threatened the use of force to take the cigarettes. From this evidence, the jury reasonably could have determined that the defendant had the intent to commit a larceny and did so through the use or threatened use of immediate force. Cf. *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992) ("fact that the defendant stood by silently when a gun was displayed in order to gain entry and then to intimidate the occupants of the premises is evidence from which the jury might reasonably have inferred the defendant's acquiescence in this enlarged criminal enterprise").

After examining the evidence presented in the light most favorable to sustaining the verdict, we cannot say that the jury's inferences leading to the defendant's conviction on the count of conspiracy to commit robbery were illogical or unreasonable.

B

The defendant next claims that there was insufficient evidence to convict him, as either a principal or an accessory, of robbery in the second degree as to Salaou, pursuant to § 53a-135.[15] Specifically, the defendant

---

intended the larceny and carried it out through the use or threatened use of physical force.

[15] General Statutes § 53a-135 (a) provides: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present; or (2) in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what

argues that he did not intend to threaten the use of immediate force. He further argues that he cannot be held liable as an accessory because he did not intend to aid Arnold in the commission of the robbery of Salaou. We conclude that there was sufficient evidence for the jury reasonably to have found the defendant guilty of robbery in the second degree.

The state proceeded against the defendant under a theory of accessory liability for the robbery of Salaou.[16] "To justify a conviction as an accessory, the state must prove both that the defendant had the intent to aid the principal and that, in so aiding, he had the intent to commit the crime. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the [principal] must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and willingly assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." (Internal quotation marks omitted.) *State* v. *McClendon*, 56 Conn. App. 500, 505, 743 A.2d 1154 (2000); see also General Statutes § 53a-8 (a).[17]

In examining the sufficiency of the evidence supporting the conviction for conspiracy to commit robbery in the second degree, we already have concluded that the jury reasonably could have found that the defendant had the intent to commit the larceny and accomplished it by the use or threatened use of physical force. We

he represents by his words or conduct to be a deadly weapon or a dangerous instrument."

[16] We note that "there is no difference between being convicted as a principal or as an accessory"; (internal quotation marks omitted) *State* v. *Smith*, supra, 86 Conn. App. 266; and accordingly limit our review to whether there was sufficient evidence to convict the defendant of robbery in the second degree as an accessory.

[17] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

are therefore left to examine whether the defendant had the intent to aid the principal in the commission of the robbery. The defendant entered the store before Arnold, yet waited until Arnold announced the robbery to join him near the register and take the cigarettes. From these facts, the jury reasonably could have inferred that the defendant's criminal activity immediately after Arnold announced the robbery was intended to aid Arnold by obtaining additional property from the store.[18] Such actions are not passive acquiescence or innocent acts, but rather acts that facilitate and consummate the robbery. See *State* v. *McClendon*, supra, 56 Conn. App. 505 (defendant found to be accessory where he spent evening with two men following victims; when one man attacked victims, defendant moved behind attacker and alongside other man).

The defendant further argues that he lacked the intent to aid Arnold because he left the store while Arnold was still inside robbing Zuerblis. "A defendant may be convicted as an accessory if he intentionally assists in the commission of the crime, regardless of whether he actively participated in every stage of its commission." *State* v. *Smith*, supra, 86 Conn. App. 267. The defendant's liability as an accessory for the robbery of Salaou, therefore, is not alleviated merely because he did not participate actively in the portions of the robbery occurring after he had left the store.

C

The defendant next claims that there was insufficient evidence to convict him of robbery in the second degree of Zuerblis. He argues that the jury reasonably could not have found that he intended to rob Zuerblis or had the intent to aid Arnold in doing so, and, therefore, he

---

[18] The defendant further aided a member of the conspiracy when, after fleeing the scene, Sledge received a portion of the profit from the sale of the stolen cigarettes.

cannot be held liable as a principal or accessory because he was a mere passive observer. We conclude that there was sufficient evidence for the jury reasonably to have found the defendant guilty of the robbery of Zuerblis under the *Pinkerton* doctrine.[19]

We begin by setting forth the scope of *Pinkerton* liability, which our Supreme Court expressly adopted in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under the *Pinkerton* doctrine, "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 491, 820 A.2d 1024 (2003).

The defendant argues that the facts do not support his liability for the robbery of Zuerblis because, for the portion of time that he was present for the robbery, he was a mere passive observer of Arnold's actions. Our Supreme Court has noted that "a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would

---

[19] The defendant argues that principal or accessory liability are the only theories available to the state. He asserts that the court should not have given an instruction on liability under the *Pinkerton* doctrine because the robbery of Zuerblis was the subject of the original conspiracy charge. We disagree and address that claim with his other challenges to the jury instructions.

be unjust to hold the defendant responsible for the criminal conduct of his coconspirator." (Internal quotation marks omitted.) Id., 493. This is not such a case. Here, we have concluded that there was sufficient evidence for the jury reasonably to have concluded that the defendant was guilty of the conspiracy to commit robbery and guilty of the actual robbery of Salaou. The 7-Eleven was open to the public at the time the defendant entered to commit the robbery. Giving deference, as we must, to the reasonable inferences of the jury, it reasonably was foreseeable that a customer might be present at that time and that a coconspirator, already in the act of committing a robbery, might also rob additional persons to obtain more property. Cf. *State* v. *McFarlane*, 88 Conn. App. 161, 167–68, 868 A.2d 130 (defendant found guilty of larceny in first degree, burglary in third degree, conspiracy to commit larceny in first degree, burglary in third degree, present when burglary planned, served as lookout during commission of crimes, received share of proceeds), cert. denied, 273 Conn. 931, 873 A.2d 999 (2005). Under these circumstances, we conclude that the extent of the defendant's participation was not so attenuated and remote that it would be unjust to hold him responsible for the criminal conduct of his coconspirator, Arnold. See *State* v. *Garner*, 270 Conn. 458, 486, 853 A.2d 478 (2004) (defendant participated in planning of crimes, was present at scene with knowledge crimes were being committed, acted as lookout).

## II

The defendant's next two claims challenge the jury instructions on the element of intent as it relates to each of the three charges and to liability under the *Pinkerton* doctrine. We conclude that the court's instructions were proper.

The defendant concedes that the jury instruction claims were not preserved at trial and, accordingly, now

seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant may prevail on unpreserved claims only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 359–60, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

We conclude that, in the present case, the first prong of *Golding* is satisfied because the record is adequate to review the defendant's claim.[20] We further conclude that each of the defendant's instructional claims meets the second prong, as they are of constitutional magnitude. "Due process requires that the state establish beyond a reasonable doubt every essential fact necessary to establish the crime charged . . . including

---

[20] The state asserts that the defendant's claim is unreviewable because the general verdict does not specify whether the jury found the defendant guilty under a theory of accessory liability or under the *Pinkerton* doctrine. See *State* v. *Battista*, 31 Conn. App. 497, 506, 626 A.2d 769, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993). "[A] factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation." (Internal quotation marks omitted.) *State* v. *Sanko*, 62 Conn. App. 34, 40, 771 A.2d 149, cert. denied, 256 Conn. 905, 772 A.2d 599 (2001). Unlike *Battista* and other cases in which there was an unchallenged factually supported basis for liability, the defendant has challenged the instructions on the intent element under both possible theories of liability. We will, therefore, review the defendant's claims under *Golding*.

intent where intent is one of those elements." (Internal quotation marks omitted.) *State* v. *DeBarros*, 58 Conn. App. 673, 680, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000). A claim of an improper instruction on *Pinkerton* liability also falls within the ambit of the essential elements needed to establish the crime charged.[21] See *State* v. *Peeler*, supra, 271 Conn. 360, citing *State* v. *Coltherst*, supra, 263 Conn. 490; *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995) ("an improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process right to a fair trial, and thus require the reversal of a conviction based upon that instruction"). Our analysis of each claim, therefore, will begin with the third prong of *Golding*, which requires that we determine whether the alleged constitutional violation clearly exists and deprived the defendant of a fair trial.

We set forth our standard of review for each of the defendant's remaining claims. "The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury

---

[21] The state asserts that the defendant's challenge to the *Pinkerton* instruction is unreviewable because *Golding* review was not explicitly invoked. The defendant, in his brief, requested *Golding* review of the intent element of the jury instructions. Because the *Pinkerton* instruction pertains to this element of the crime charged, we will address it as a part of the same *Golding* review.

charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, supra, 271 Conn. 360–61.

A

The defendant first claims that the court's instructions on intent were insufficient and misled the jury, and, therefore, deprived him of his right to a fair trial. We disagree and, accordingly, conclude that his claim fails under *Golding* review because the constitutional violation did not exist.

1

The defendant first argues that the court improperly instructed the jury on the element of intent for robbery because the instructions did not state separately that the defendant needed the intent to use or threaten the use of physical force. The defendant concedes, and the record reflects, that the court instructed the jury on the definition of larceny and the intent necessary to commit larceny. The court then instructed the jury that it "must determine whether the larceny was accomplished by physical force" and described the nature of the physical force necessary for robbery, which the defendant also does not challenge. As we already have noted, the intent element of robbery relates to the commission of the larceny and not to the use or threatened use of physical force. See General Statutes §§ 53a-119 and 53a-133. Accordingly, we conclude that the court's instructions properly informed the jury on the elements of larceny and robbery.

2

The defendant next argues that the instructions were improper because the jury was allowed to consider, in

determining guilt as to the robbery charges, both types of statutory intent as defined in General Statutes § 53a-3 (11).[22] Specifically, he argues that the improper instruction allowed the jury to find him guilty of the robbery without having to find that he had the intent to "deprive another of property or to appropriate the same to himself or a third person"; General Statutes § 53a-119; but rather only that he had the intent to engage in conduct that caused the result. Although we conclude that this instruction regarding intent was improper, in examining the instructions as a whole, we conclude that the defect was harmless.

"It is axiomatic that the definition of intent as provided in § 53a-3 (11) embraces both the specific intent to cause a result and the general intent to engage in proscribed conduct. It has become axiomatic, through decisional law, that it is improper for a court to refer in its instruction to the entire definitional language of § 53a-3 (11), including the intent to engage in conduct, when the charge relates to a crime requiring only the intent to cause a specific result." *State* v. *Sivak*, 84 Conn. App. 105, 110, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004).

This court has further noted, however, that in cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring specific intent almost always has been upheld because a proper intent instruction was also given. The erroneous instruction, therefore, was not harmful beyond a reasonable doubt.[23] See id., 111; cf. *State* v. *Francis*, 246

---

[22] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

[23] One exception is *State* v. *DeBarros*, supra, 58 Conn. App. 681–84, in which the improper definition was read numerous times as a specific definition of intent for the crimes charged. In this case, however, the defendant refers to the improper definition being read only once in conjunction with a proper instruction on the intent element of larceny. This court recognized

Conn. 339, 358–59, 717 A.2d 696 (1998); *State* v. *Austin*, 244 Conn. 226, 232, 710 A.2d 732 (1998); *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995). In *State* v. *McColl*, 74 Conn. App. 545, 579, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003), as in this case, the court, in connection with the crime of robbery in the first degree, improperly read the entire statutory definition of intent. We nonetheless concluded that the jury was not misled because the court, in discussing larceny, also iterated that the defendant must wrongfully take property with the intention of depriving its possessor or owner of possession. Id., 579–80. Similarly, in this case a proper instruction on the specific intent required for larceny[24] was also given.[25] Examining the jury instructions in their totality, including proper instruction on the intent element of larceny, we cannot conclude that the court's use of the entire statutory definition of intent misled the jury and deprived the defendant of a fair trial.

3

The defendant further argues that the court's instructions on the intent element of conspiracy were flawed

in *State* v. *Sivak*, supra, 84 Conn. App. 112, however, that "appellate review should consist of more than a numerical count of how many times the instruction was correct rather than incorrect." We nonetheless concluded in *Sivak* that the instruction was harmful because the "other language relating to intent in the same charge is misleading." Id. That is not the case here.

[24] The court instructed the jury as follows: "Second, the second element that you must consider in determining whether the state has proven larceny is that of intent.

"The state must prove beyond a reasonable doubt that [at] the time the defendant wrongfully took, obtained or withheld property from an owner, he intended to deprive the owner or some other person of it, or that he intended to appropriate it to himself or a third person. Either intent to deprive, or intent to appropriate must be proven in order to find [that] the defendant committed larceny."

[25] The defendant does not specifically challenge the substance of the court's instruction on the intent element of larceny, but rather argues that the court gave no proper instruction to clarify the intent element in larceny.

in both the intent to agree and the intent to commit the crime portions and, therefore, deprived him of his right to a fair trial. We disagree.

The defendant first asserts that the instructions were improper because they merely instructed the jurors that "they only need to find that [the defendant] had the intent that the conduct of [Arnold] happen" and, therefore, did not instruct the jurors that they must find that he had the intent to agree or to conspire. The court did, in fact, instruct the jury on the requirement that the defendant intend to agree and gave a lengthy description of what conduct would constitute or imply such an agreement.[26]

---

[26] The court's instructions were as follows: "To constitute the crime of conspiracy, the state must prove the following elements beyond a reasonable doubt:

"One, that there was an agreement between the defendant and one or more persons to engage in conduct constituting the crime. . . .

"Again, one, the first element is the agreement between two or more persons. It is not necessary for the state to prove that there was a formal or expressed agreement between them. It is sufficient to show that the party knowingly engaged in a mutual plan to do a criminal act.

"Circumstantial evidence is sufficient to prove that there was an agreement between, because conspiracies by their very nature are formed in secret and only rarely can be proven other than by circumstantial evidence. The mere knowledge, acquiescence or approval of the object of the agreement without cooperation or agreement to cooperation, however, is not sufficient to make one a party to a conspiracy to commit the criminal act. Mere presence at the scene, even when coupled with knowledge of the crime is insufficient to establish guilt.

"In order to convict a person of the conspiracy, the state need not show that such person had directly communicated with all other conspirators. It is not necessary that each conspirator be acquainted with all the others or even know their names. It is sufficient if he has come to an understanding with at least one of the others and has come to such understanding with that person to further a criminal purpose.

"Additionally, it is not essential that he know the complete plan of the conspiracy and all of its details. It is enough that he knows that a conspiracy exists or that he is creating one and that he is doing it with at least one person in agreement to commit a crime.

"Therefore, in order to convict the defendant on the charge contained in the information, the first element that the state must prove beyond a reasonable doubt is [that] the defendant entered into an agreement with at least one other person, personally, to engage in conduct constituting the crime."

The defendant further asserts that the instructions were improper because they did not sufficiently advise the jurors that they must find that the defendant had the intent to commit the robbery when he entered into the conspiracy. This problem, he argues, was compounded by the alleged defects in the intent element of the robbery instruction. The court, in discussing conspiracy, instructed: "The defendant may not be found guilty unless the state has proven beyond a reasonable doubt that he had specific intent to violate the law when he entered into the agreement to engage in conduct constituting a crime." This portion of the instruction, however, cannot be "critically dissected in a microscopic search for possible error"; (internal quotation marks omitted) State v. Peeler, supra, 271 Conn. 361; but rather is to be considered with the sum of the instructions. Id. We already have concluded that the intent instructions as to the robbery charges were proper. Taking the instructions in their totality, including proper instructions on the elements of robbery and conspiracy, the court's instructions were sufficiently correct in law, adapted to the issues and ample for the guidance of the jury.

B

The defendant next claims that the court deprived him of his right to a fair trial because it improperly instructed the jury on Pinkerton liability. He first argues that a Pinkerton instruction cannot be given for crimes that were the object of the original conspiracy. He asserts that the conspiracy charge contained within the information does not specify the target of the robbery that was the subject of the conspiracy, and therefore, must be construed to include the robbery of Zuerblis.[27]

[27] The third count of the information charged the defendant as follows: "Said Assistant State's Attorney further accused the defendant, JEROME LEGGETT, of the crime of CONSPIRACY TO COMMIT ROBBERY IN THE SECOND DEGREE, in violation of Connecticut General Statutes §§ 53a-135 (a) (2); 53a-48 (a) and alleges that on or about October 31, 2001, in the

Accordingly, the defendant argues, a *Pinkerton* instruction does not conform to the information. "When determining the scope of charges contained in an information, we construe the information liberally in favor of the state. . . . [A] conviction based upon a challenged information is valid unless the information is so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 92 Conn. App. 92, 103, 883 A.2d 813, cert. granted on other grounds, 276 Conn. 929, 889 A.2d 818 (2005).[28] Reading the information liberally in favor of the state, as we must, we conclude that a reasonable construction of the scope of the conspiracy charge included the robbery of Salaou, but not the robbery of Zuerblis.[29] The defendant concedes that "[i]f either of the counts of robbery in the second degree were not part of the conspiracy charge, the jury may have been able to apply *Pinkerton* liability to the other count." A *Pinkerton* instruction, therefore, conforms to the information and was properly given.

The defendant further argues that the *Pinkerton* instruction deprived him of his right to a fair trial

vicinity of 161 Oakwood Avenue, West Hartford, Connecticut, the defendant, with the intent that conduct constituting the crime of ROBBERY IN THE SECOND DEGREE be performed, agreed with another person to engage in and cause the performance of such conduct and any one of them did an overt act in performance of such conspiracy."

[28] In *DeJesus*, the information had a unique symmetrical format in which the substantive offense, attempt to commit murder, for which *Pinkerton* liability was sought, related to a conspiracy charge naming a particular victim. We concluded that, under those circumstances, a *Pinkerton* instruction was inappropriate without identifying that the specific intent required on the conspiracy charge was to cause the death of that particular victim. *State* v. *DeJesus*, supra, 92 Conn. App. 108–109. The same situation does not exist in this case.

[29] Moreover, as we have discussed, conspiracy is a specific intent crime. The conspiracy charge, therefore, cannot be construed to include both counts of robbery.

because it allowed the jury to find him guilty of robbery without finding that he had the specific intent to commit the offense. *Pinkerton* allows the jury to impute to the defendant certain conduct by a coconspirator reasonably foreseeable as a natural consequence of the conspiracy. *State* v. *Coltherst*, supra, 263 Conn. 491. Our Supreme Court has noted that it "fail[s] to see why a constitutional flaw appears when *Pinkerton* applies to the *intent* that accompanies that conduct. Both the intent and the conduct are essential elements of the crime and are subject to the principles of *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), that due process requires the state to prove every element of the offense charged beyond a reasonable doubt." (Emphasis in original.) *State* v. *Coltherst*, supra, 494. We conclude that the *Pinkerton* instruction, therefore, properly instructed the jury as to the element of intent and that the defendant's due process rights were not violated. The defendant's claim, therefore, fails to satisfy the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.